Jerome J. Schlichter (SBN 054513)
jschlichter@uselaws.com
Kurt C. Struckhoff
kstruckhoff@uselaws.com
SCHLICHTER BOGARD & DENTON LLP
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934

*Counsel for Plaintiffs*

William H. Edmonson (SBN 243445)
will@whelawfirm.com
LAW OFFICE OF WILL EDMONSON
9157 Sunset Boulevard, Suite 213
West Hollywood, CA 90069
Telephone: (424) 248-9581

*Local Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
(Western Division)**

| | |
|---|---|
| MICHELLE MILLS, COY SARELL, CHAD WESTOVER, BRENT ALESHIRE, BARBARA KERSHNER, PAULA SCHAUB, and JENNIFER SILVA, individually and as representatives of a class of participants and beneficiaries on behalf of the Molina Salary Savings Plan,<br><br>*Plaintiffs*,<br><br>v.<br><br>MOLINA HEALTHCARE, INC., THE BOARD OF DIRECTORS OF MOLINA HEALTHCARE, INC., THE MOLINA SALARY SAVINGS PLAN INVESTMENT COMMITTEE, and NFP RETIREMENT, INC.,<br><br>*Defendants*. | Case No. 2:22-cv-1813-ODW<br><br>FIRST AMENDED COMPLAINT<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>Judge: Hon. Otis D. Wright II |

1.      Plaintiffs Michelle Mills, Coy Sarell, Chad Westover, Brent Aleshire, Barbara Kershner, Paula Schaub, and Jennifer Silva, individually and as representatives of a class of participants and beneficiaries of the Molina Salary Savings Plan ("the Plan"), bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against Defendants Molina Healthcare, Inc., the Board of Directors of Molina Healthcare, Inc., the Molina Salary Savings Plan Investment Committee, and NFP Retirement, Inc. for breach of fiduciary duties under ERISA.[1]

2.      As Plan fiduciaries, Defendants are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable and Plan investments are prudent. These duties are the "highest known to the law" and must be discharged with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of acting in the exclusive best interest of participants, Defendants caused the Plan to invest in flexPATH's untested target date funds, which replaced established and well-performing target date funds used by participants to meet their retirement needs. Defendants also failed to use the Plan's bargaining power to obtain reasonable investment management fees, which caused unreasonable expenses to be charged to the Plan.

3.      To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (a)(3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction

_____

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

5.      **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where the Plan is or was administered, where at least one of the alleged breaches took place, or where at least one defendant resides or may be found.

6.      **Standing.** An action under §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to bring a civil action to seek relief on behalf of a plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury, each Plaintiff has suffered such an injury, in at least the following ways:

a.   The Named Plaintiffs suffered harm to their individual accounts as a result of Defendants' fiduciary breaches. During the proposed class period, each of the Named Plaintiffs invested in the flexPATH Index target date funds provided in the Plan. By providing flexPATH's target date funds, Defendants caused millions of dollars in performance losses to all participants who invested in these funds.

b.   The Named Plaintiffs suffered harm to their individual accounts as a result of Defendants selecting and retaining higher-cost versions of the Plan's investments. For instance, each of the Named Plaintiffs invested in higher-cost share classes of flexPATH's target date funds when lower-cost shares were available for the identical investments.

- 3 -

Plaintiffs Westover and Silva also invested in the Fidelity Low-Priced Stock Fund when lower-cost shares were available to the Plan. Had Defendants provided the lowest-cost shares or versions of the Plan's investments, every participant's account would have had fewer investment management fees deducted and would have been of higher value in light of those fees and the investment return on those fees.

## PARTIES

### Molina Salary Savings Plan

7. The Molina Salary Savings Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34). All eligible employees of Molina Healthcare, Inc. and subsidiaries may participate in the Plan.

8. The Plan was established on January 1, 1990 and is maintained under a written document in accordance with 29 U.S.C. §1102(a)(1), last amended and restated effective April 5, 2021.

9. Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the current value of that account, which will depend on the amount contributed to the account by the employee and employer and on the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan and the Plan's fees and expenses.

10. As of December 31, 2015, the Plan had $305 million in assets and 13,303 participants with account balances. By December 31, 2020, the Plan had $741 million in assets and 15,686 participants with account balances.

### Plaintiffs

11. Michelle Mills was formerly employed by Molina Healthcare of Ohio. She resides in Blacklick, Ohio. She participated in the Plan until approximately August 2021. However, she is still a "participant" under 29 U.S.C. §1002(7) for

- 4 -

purposes of bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because she is eligible to receive her share of the amounts by which her account would have been greater had Defendants not breached their fiduciary duties.

12. Coy Sarell was formerly employed by Molina Healthcare, Inc. He resides in Garden Grove, California. He participated in the Plan through May 2019. However, he is still a "participant" under 29 U.S.C. §1002(7) for purposes of bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because he is eligible to receive his share of the amounts by which his account would have been greater had Defendants not breached their fiduciary duties.

13. Chad Westover was formerly employed by Molina Healthcare of Utah. He resides in Sandy, Utah. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

14. Brent Aleshire was formerly employed by Molina Healthcare of Illinois. He resides in Oconomowoc, Wisconsin. He participated in the Plan until approximately February 2022. However, he is still a "participant" under 29 U.S.C. §1002(7) for purposes of bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because he is eligible to receive his share of the amounts by which his account would have been greater had Defendants not breached their fiduciary duties.

15. Barbara Kershner was formerly employed by Pathways of Maine, a participating employer in the Plan. She resides in Orrington, Maine. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

16. Paula Schaub was formerly employed by Molina Healthcare of New Mexico. She resides in Albuquerque, New Mexico. She participated in the Plan until approximately October 2020. However, she is still a "participant" under 29 U.S.C. §1002(7) for purposes of bringing this action on behalf of the Plan under 29

- 5 -

U.S.C. §1132(a)(2) because she is eligible to receive her share of the amounts by which her account would have been greater had Defendants not breached their fiduciary duties.

17. Jennifer Silva was formerly employed by Molina Healthcare, Inc. She resides in Simpsonville, South Carolina. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

## Defendants

18. Molina Healthcare, Inc. ("Molina") is a domestic corporation incorporated in Delaware. Molina provides managed health care services under Medicaid and Medicare programs and through state insurance programs. Molina is headquartered in Long Beach, California.

19. Molina is the Plan sponsor under 29 U.S.C. §1102(a)(1) and Plan administrator under 29 U.S.C. §1002(16). The Plan document presently designates Molina as Plan administrator and named fiduciary under 29 U.S.C. §1102(a)(1) with full power and full responsibility with respect to the management and administration of the Plan. As alleged herein, Molina exercises discretionary authority or discretionary control respecting the management of the Plan, exercises authority or control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

20. The Board of Directors of Molina Healthcare, Inc. ("Board") established the Molina Salary Savings Plan Investment Committee ("Investment Committee") through the Molina Salary Savings Plan Investment Committee Charter ("Charter"). In accordance with the Charter, the Board delegated authority to the Investment Committee, including establishing and maintaining an Investment Policy Statement ("IPS") of the Plan, selecting investment options and investment managers, evaluating the performance of Plan investments and recommending

- 6 -

investment option changes, administering the Plan, and reviewing issues, making decisions and implementing them in accordance with ERISA and the terms of the Plan. The Board has the authority to appoint or remove members of the Investment Committee and determined the employees of Molina to serve on the Investment Committee. As alleged herein, the Board exercises discretionary authority or discretionary control respecting the management of the Plan, exercises authority or control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

21.   The Investment Committee was delegated authority by the Board to administer the Plan. Among the delegated authority from the Board, and as indicated *supra*, the Investment Committee has the authority to select, monitor and remove Plan investments, among other duties. As alleged herein, the Investment Committee exercises discretionary authority or discretionary control respecting the management of the Plan, exercises authority or control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

22.   Because the individual Molina Plan fiduciaries acted as alleged herein as agents of Molina, these defendants are collectively referred to hereafter as "Molina" unless otherwise indicated.

23.   NFP Retirement, Inc. (dba 401k Advisors, Inc.) is a registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in Aliso Viejo, California. Effective March 1, 2010, Molina appointed NFP as the Plan's investment consultant or fiduciary investment advisor as defined by 29 U.S.C. §1002(21)(A)(ii). NFP provides investment advice to Molina related to the selection, monitoring and replacement of Plan investments,

- 7 -

the selection of service providers, the development and ongoing evaluation of the Plan's IPS, and the assessment of the reasonableness of Plan expenses.

24.     On November 11, 2021, in accordance with 29 U.S.C. §1024(b), Plaintiffs requested from the Plan administrator documents related to the operation and administration of the Plan. On December 10, 2021, the Plan administrator responded to that request for information but did not provide documents related to the process employed by Molina in making decisions on behalf of the Plan.

### ERISA'S FIDUCIARY STANDARDS

25.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

26.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan, affiliated businesses or brokerage firms and those who provide investment products. Fiduciaries must ensure that the amount of fees paid

- 8 -

to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

27.   An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). Prudence requires a review at "regular intervals." *Id.* When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property[.]'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting RESTATEMENT (SECOND) OF TRUSTS §227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id*. at 435.

28.   A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries have a "duty to monitor all plan investments and remove any imprudent ones." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 740 (2022); *see also* 29 C.F.R. §2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 575 U.S. at 530.

29.   ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of

- 9 -

fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

>    (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
>    (2)   if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
>    (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## BACKGROUND FACTS

30.   "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[2] The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only 11 of the Fortune 100 companies offered defined benefit plans to newly hired employees. Defined contribution plans have become America's retirement system.

31.   A fundamental difference between traditional pension plans and defined contribution plans is that, in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its

---

[2] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, TOWERS WATSON RESEARCH INSIDER, Oct. 2012.

- 10 -

commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks.

32.    Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Plan expenses can "significantly reduce the value of an account in a defined-contribution plan." *Id.* The fees assessed to participants are generally attributable to two types of services: plan administration and investment management.

33.    The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. The investment alternatives each have their own fees, usually expressed as a percentage of assets under management, or "expense ratio." For example, if a fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points (bps). (One basis point is equal to $1/100^{th}$ of one percent.) The fees deducted from a fund's assets reduce the value of the shares and hence reduce the returns that participants receive on their investments.

34.    These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[3] Over a 40-year career,

---

[3] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

- 11 -

this difference in fees can reduce a participant's retirement savings by almost $500,000.[4]

35.    Academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

36.    Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for large defined contribution plans which have the bargaining power to obtain the highest level of service and the very lowest fees. The fees available to these plans are orders of magnitude lower than the much higher retail fees available to small investors.

---

[4] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.

37.    The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for plan-related services. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers through investment returns. The level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

38.    Fiduciaries must be cognizant of a service provider's self-interest in maximizing fees and cannot simply accede to the provider's desires and recommendations to include the provider's proprietary funds and services that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service provider's interest, fiduciaries must conduct their own independent investigation into the merits of a particular investment or service by considering alternatives.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

I.    **Defendants breached their fiduciary duties by causing the Plan to use flexPATH's untested and novel target date funds as Plan investment options, which were inferior to established target date funds available to the Plan.**

A.    **The flexPATH Index target date funds.**

39.    Target date funds are designed to provide a single diversified investment vehicle for participants. In general, they can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio. Target date funds rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's target retirement date. For instance, target date "2030" funds are designed for individuals who intend to retire in 2030.

- 13 -

40.     The flexPATH Index target date funds are collective investment trusts maintained by Wilmington Trust, N.A. ("Wilmington Trust"), a bank that serves as the trustee for the funds. Collective investment trusts are investment vehicles maintained by a bank that consist of pooled assets of "retirement, pension, profit sharing, stock bonus or other trusts exempt from Federal income tax". 29 C.F.R. §9.18(a)(2). A collective investment trust is similar to a mutual fund or other pooled investment vehicle because it also invests in a variety of securities to create a diversified investment portfolio.

41.     flexPATH Strategies, LLC ("flexPATH") is the subadvisor of the flexPATH Index target date funds. As the subadvisor, flexPATH provides investment advisory services and has authority over investing fund assets and developing the investment strategies for the funds.

42.     As explained *infra*, flexPATH had limited experience managing assets when the flexPATH Index target date funds were first added to the Plan in May 2016. flexPATH was not registered as an investment adviser with the SEC until February 2015 and did not begin managing assets until June 2015. Shortly thereafter, flexPATH launched the flexPATH Index target date funds in December 2015 (for the Aggressive and Conservative funds) and January 2016 (for the Moderate funds). Accordingly, the full suite of the flexPATH Index target date funds did not exist until January 2016.

43.     When the flexPATH target date funds were launched, their target date fund management style had never been used in any target date fund solution offered in the marketplace. The novel and untested target date fund management style combined index or passive management strategies with multiple glidepaths. A glidepath refers to how the fund's target asset allocations among a mix of investments, such as stocks, bonds and cash equivalents, are expected to change over time. As the participant's target date approaches, the asset allocations transition to a mix of more conservative investments.

- 14 -

44.    Each "target date" fund had three glidepaths varying by investment style and risk tolerance. For instance, for the 2030 target retirement date, flexPATH provided three separate target date funds: flexPATH Index Aggressive 2035 Fund, flexPATH Index Moderate 2035 Fund, and flexPATH Index Conservative 2035 Fund. Because three separate target date funds are offered for a single target retirement date, the number of target date funds offered for a plan triples. This adds further complexity to the fund lineup from which participants select options to invest for retirement.

45.    The flexPATH Index target date funds were "off-the-shelf" target date funds or funds designed for and offered to defined contribution plans generally. They were not "custom" or "customized" target date funds, which are funds designed by an investment adviser or consultant for a single plan sponsor taking into account that plan's unique demographics and participant base. Because custom target date funds are constructed for a specific defined contribution plan, they are only available to that plan's participant population. In contrast, the flexPATH target date funds are marketed and sold to unrelated defined contribution plan sponsors.

46.    The financial statement for the flexPATH Index target date fund series has described the fees charged to investors as:

"All asset-based fees are based upon the net assets as determined at the end of each preceding business day as set forth in the table below:

| flexPATH Index I Series | Fee Class I1 |
| --- | --- |
| Trustee Fee | 0.030% |
| Service Provider Fee | 0.000% |
| Investment Consultant Fee | 0.060% |
| Management Services Fee | 0.100% |

flexPATH Strategies, LLC is compensated for its investment advisory and consultant services provided to each fund."

- 15 -

47.     flexPATH did not actually invest the flexPATH target date funds' underlying assets. Rather, flexPATH utilized a "fund of funds" structure for the target date funds, whereby it allocated fund assets among various underlying funds managed by an unaffiliated investment manager. However, not all of the flexPATH Index target date funds invested in more than one underlying fund.

48.     The Financial Statements for the Wilmington Trust Collective Investment Trust Funds Subadvised by flexPATH report the asset allocation of the flexPATH Index target date fund. For the flexPATH Index Aggressive target date funds, the funds invested in one or two BlackRock LifePath Index target date funds, *e.g.*, the flexPATH Index Aggressive 2025 Fund invests in the BlackRock LifePath Index 2030 and 2035 funds (F shares). The flexPATH Index Moderate target date funds invested in the BlackRock LifePath Index target date fund corresponding to the target retirement date, *e.g.,* the flexPATH Index Moderate 2025 Fund invests in the BlackRock LifePath Index 2025 Fund (F shares). And the flexPATH Index Conservative target date funds invested in the BlackRock LifePath Index Conservative target date fund corresponding to the target retirement date, *e.g.,* the flexPATH Index Conservative Index 2025 Fund invests in the BlackRock LifePath Index Conservative 2025 Fund (F shares).

49.     NFP did not disclose to Molina that the flexPATH Index target date funds invested in one or more underlying BlackRock target date funds, nor did NFP present this information for Molina's consideration prior to the decision to add the flexPATH Index target date funds to the Plan. Accordingly, these underlying funds were not part of the fiduciary decision-making process when determining whether to include the flexPATH Index target date funds in the Plan.

50.     Because flexPATH invested the underlying assets of the flexPATH Index target date funds in BlackRock target date funds, additional fees were charged compared to the fees that would have been charged to investors had they invested directly in BlackRock's funds. The additional fees are revealed by

- 16 -

comparing the fees charged by the underlying BlackRock funds. The BlackRock LifePath Index target date funds charge 8 bps. In contrast, flexPATH charged Plan participants 24 bps. This resulted in an additional 16 bps—200% more—to invest in flexPATH's index target date funds.

51.    When presenting the flexPATH Index target date funds to Molina for consideration, NFP did not disclose the additional fees that flexPATH charged on top of those fees charged by the underlying BlackRock target date funds. Accordingly, Molina did not consider the additional fees charged by flexPATH when determining whether to add the flexPATH Index target date funds to the Plan.

**B.    The conflicted relationship between NFP and flexPATH.**

52.    The flexPATH funds are proprietary investment products of NFP and flexPATH. NFP specifically markets and promotes the use of the flexPATH funds. The ownership structure of NFP and flexPATH illustrates the close affiliation between the two companies. National Financial Partners Corporation (NFP Corporation) owns NFP. NFP Corporation, along with NFP's Chief Executive Officer (CEO) (Vincent Giovinazzo) and President (Nicholas Della Vedova), own flexPATH. In particular, NFP's CEO has a 25%–50% ownership interest in flexPATH, and NFP's President has a 10%–25% ownership interest. flexPATH and NFP are operated by the *same* corporate officers and headquartered in the *same* office. The CEO, President, Chief Operations Officer, and Chief Compliance Officer for NFP also hold those positions for flexPATH. As reported on the companies' Forms ADV filed with the SEC, these individuals are control persons with authority to direct the management of each company (flexPATH and NFP).

53.    NFP's Form ADV Brochure Part 2A for NFP dated March 2020 confirms this inherent conflict of interest in recommending the use of affiliated products or services, disclosing that NFP or "its associated persons may receive compensation" for "services and/or products" affiliated with NFP Corporation or its affiliates. Moreover, NFP employs Investment Advisor Representatives ("IARs"),

- 17 -

who are individuals within the firm that provide investment advice to clients. The IARs are commonly co-employed by flexPATH. These individuals therefore may also receive compensation as an IAR of flexPATH. In fact, certain NFP IARs derive their entire compensation from flexPATH. Apart from the IARs, NFP's President, Chief Executive Officer and Chief Investment Officer are co-employed by flexPATH. Every IAR listed in the flexPATH ADV is co-employed by NFP.

54.     Plan participants were not informed that NFP was the entity that recommended that Molina consider the flexPATH Index target date funds for the Plan, or that NFP had a profound conflict of interest when presenting its own funds for use in the Plan. Plan participants also were not informed of the decision-making process that Defendants employed prior to including the flexPATH Index target date funds. Molina did not even inform the Department of Labor in the Financial Statements to the Plan's Forms 5500 that flexPATH was a party-in-interest or that the Plan's investments in the flexPATH funds were party-in-interest transactions under ERISA. *See* 29 U.S.C. §1002(14) (a party in interest includes any plan fiduciary or person providing services to the plan).

**C.   Contrary to established fiduciary practices, and acting on the advice of NFP, Molina added the Index target date funds to the Plan even though they were newly launched and untested.**

55.     On or about May 16, 2016, Molina added the flexPATH Index target date funds to the Plan. In doing so, Molina replaced the Vanguard Target Retirement target date funds, which as explained *infra*, were established and well-performing target date funds in the marketplace. The decision to add the flexPATH Index target date funds to the Plan resulted in over $210 million of the Plan's assets (or 45% of the Plan's total assets) being transferred to the flexPATH Index target date funds during 2016. This amount increased to over $360 million (or 57% of the Plan's assets) as of December 31, 2019.

56.     Molina added the flexPATH Index target date funds to the Plan, and

- 18 -

NFP presented them to Molina for use in the Plan, even though flexPATH's target date fund management style had never been used in any target date fund offered in a 401(k) plan. The novel and untested management style of the flexPATH Index target date funds was magnified by the inexperience of the funds' investment manager (flexPATH), which had no established track record as an investment manager, had only managed assets for investors since June 2015, and only recently completed the launch of the flexPATH Index target date funds in January 2016. Despite these facts, Molina placed flexPATH's target date funds in the Plan on or about May 16, 2016.

57.     The decision to add the flexPATH Index target date funds to the Plan benefitted NFP and flexPATH by providing an immediate and substantial transfer of over $200 million of the Plan's assets into these brand-new, untested target date funds. The Plan's investment of seed money substantially increased NFP's and flexPATH's assets under management in these investment vehicles, which materially benefitted their retirement business by enhancing the marketability of these new funds.

58.     When Molina decided to add the flexPATH Index target date funds to the Plan, and when NFP recommended them for consideration, those funds did not yet exist. As a result, there was no actual performance history for Molina or NFP to consider when evaluating how the flexPATH Index target date funds performed under actual market conditions or relative to alternative target date fund strategies available to the Plan.

59.     When making investment decisions, prudent fiduciaries of defined contribution plans consider the performance history, portfolio manager experience, and manager tenure of available investment alternatives. A consistent performance history and investment strategy, among other factors, demonstrate the ability of the investment manager to generate consistently superior long-term investment results. At a minimum, prudent fiduciaries require an actual five-year performance history

- 19 -

for an investment option prior to its inclusion in a 401(k) plan.

60.     A prudent fiduciary would not have recommended or selected the flexPATH Index target date funds without a five-year performance history to assess the investment manager's ability to provide superior long-term investment returns relative to prudent alternatives available to the Plan.

61.     Given the lack of any performance history to evaluate the flexPATH Index target date funds relative to prudent alternatives available to the Plan, neither Molina nor NFP could conduct an independent investigation into the merits of adding the flexPATH Index target date funds relative to established target date fund alternatives. Nor could they conduct an independent investigation to determine whether flexPATH was sufficiently capable of managing the Plan's assets through an untested investment strategy. The inadequate track record of flexPATH and its untested target date fund strategy would have been apparent to any prudent fiduciary, and a prudent fiduciary would not have considered them at the outset for inclusion in the Plan, particularly in light of the established and well-performing target date funds provided in or available to the Plan.

62.     The decision to include the flexPATH Index target date funds in the Plan was contrary to the terms of the Plan's IPS. Molina adopted an IPS effective on September 6, 2012, which was operative at the time the decision was made to include the flexPATH Index target date funds to the Plan. The IPS governed the selection, monitoring and removal of Plan investment options. The IPS documented the investment process by which the Plan's fiduciaries determined what was prudent when overseeing the Plan's investments. The "selection of investment options" was deemed one of the Investment Committee's "most important responsibilities."

63.     The IPS specified that the Investment Committee "will select" Plan investments based on certain criteria, which included "returns comparable to returns for similar investment options." For the Qualified Default Investment Alternative

- 20 -

("QDIA"),[5] the investment selected should have investment performance "at least competitive with an appropriate style-specific benchmark and the median return for an appropriate, style-specific peer group," "risk-adjusted return measures should be evaluated by the [Investment] Committee and be within a reasonable range relative to appropriate, style-specific benchmark and peer group," and the "investment manager should demonstrate adherence to the stated investment objective," among other factors.

64.   Because the flexPATH Index target date funds had no prior performance history when the Investment Committee voted to approve their use in the Plan, Molina's decision to include the flexPATH Index target date funds, and NFP's recommendation to consider those funds for the Plan, violated the terms of the IPS. All Plan fiduciaries knew or should have known the terms of the IPS. Without *any* performance history, the flexPATH Index target date funds did not have returns comparable to similar investment options, let alone performance that was competitive with an appropriate benchmark or peer group.

65.   The Plan's IPS also specified criteria when an investment manager (or fund) may be removed. The IPS specified that a fund may be removed when the Investment Committee "has lost confidence in the manager's ability" to "Achieve performance, style, allocation and/or risk objectives" and "Maintain acceptable qualitative standards."

66.   At the time the Vanguard Target Retirement target date funds were removed from the Plan and replaced with the flexPATH Index target date funds, and despite the removal criteria for a fund under the terms of the IPS, Molina did not express any loss of confidence in Vanguard's ability to achieve performance, style, allocation and/or risk objectives, or to maintain acceptable qualitative

_____

[5] A QDIA is limited to specific categories of investments, including life-cycle or target date funds, balanced funds, and professionally managed accounts. 29 CFR §2550.404c-5(e)(4).

standards. Similarly, NFP did not express any loss of confidence in Vanguard's ability to manage its target date funds used in the Plan.

67. When NFP presented the flexPATH Index target date funds to Molina, the Vanguard Target Retirement target date funds consistently performed better than peers. Despite Vanguard's strong relative performance and established track record, NFP did not present to Molina the annualized returns and expenses of the Vanguard target date funds relative to other target date fund alternatives with established performance histories. This was in contrast to the information that NFP provided to Molina at that same time when Molina decided to replace other Plan investment options. Notably, all of the other alternative investments NFP presented to Molina for consideration had at least five years of actual performance history.

68. The decision to include the flexPATH Index target date funds was inconsistent with the Scorecard System Methodology developed by NFP to monitor Plan investments, which was incorporated into the IPS. When evaluating Plan investments, the IPS provided that asset allocation strategies were to be "evaluated over a five-year time period." Given the lack of the necessary performance history of the flexPATH Index target date funds, NFP was unable to score those funds under the system it developed to evaluate target date fund strategies. After their inclusion in the Plan, NFP likewise did not score the flexPATH Index target date funds. This was in contrast to NFP's actions when it scored other funds in the Plan's investment lineup.

69. In choosing the flexPATH Index target date funds for the Plan, Molina and NFP breached their fiduciary duties by failing to "balance the relevant factors and make a reasoned decision" that the flexPATH Index target date funds were prudent or in the best interest of the Plan's participants. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 788 (7th Cir. 2011). There was no prudent reason to cause the flexPATH Index target date funds to be placed in the Plan, because they were managed by an inexperienced investment manager under a novel and

- 22 -

untested target date fund investment strategy and also because they were recommended by a self-interested fiduciary. Molina and NFP also failed to determine whether participants would be better served by other prudent and better performing passively managed alternatives available to the Plan after considering all relevant factors.

70.    Molina and NFP did not prudently monitor the performance of the flexPATH Index target date funds after their inclusion in the Plan. When the flexPATH Index target date funds were added to the Plan, NFP did not present to Molina any style specific benchmark to evaluate the investment returns of the flexPATH Index target date funds. In August 2017, when NFP later reported the annual returns of the flexPATH Index target date funds related to NFP's style specific benchmark as of June 30, 2017, all of the flexPATH Index target date funds underperformed their benchmarks. In addition, after the flexPATH Index target date funds were included in the Plan, they underperformed other established target date funds available in the marketplace, including those managed by Vanguard and Fidelity.

71.    Despite the inferior performance of the flexPATH Index target date funds, NFP did not recommend to Molina to remove these funds from the Plan, and thus, Molina maintained these funds in the Plan for years. Not until late 2020 did Molina eventually remove the flexPATH Index target date funds and replace them with the Fidelity Freedom Index target date funds.

72.    This decision was made only after Molina hired a new investment consultant (SageView) to replace NFP during 2020, and that consultant recommended the removal of the flexPATH Index target date funds. Notably, consistent with NFP's prior failure to score the flexPATH Index target date funds given their limited performance history, the new investment consultant likewise was unable to evaluate the flexPATH Index target date funds under the terms of the Plan's IPS or under its scoring methodology used to evaluate Plan investments.

- 23 -

73.    The significance of a plan's target date fund option underscores the importance of a prudent and loyal selection process and continuous oversight of that option. Participants may rely solely on their single target date fund selection over their investment horizon to meet their retirement goals. At Molina, 40% to 58% of the Plan's total assets were invested in target date funds between 2015 and 2020. No prudent fiduciary would cause Plan participants to rely so heavily on a completely unproven fund.

**D.    Defendants caused Plan participants to suffer significant performance losses from including the flexPATH Index target date funds in the Plan.**

74.    At the time the flexPATH Index target date funds were added to the Plan, there was no shortage of prudent target date funds managed by experienced and reputable investment managers available to the Plan. The market for target date funds provided to defined contribution plans has been highly developed and competitive since target date funds were first offered to the marketplace in March 1994.[6]

75.    Vanguard's target date funds are one example of a prudent target date alternative to the flexPATH Index target date funds. Beginning in 2010, Molina offered Vanguard Target Retirement Funds as the Plan's target date fund option. Vanguard's funds were replaced by the flexPATH Index target date funds in May 2016. Molina's prior actions demonstrate that it recognized that Vanguard was a prudent target date fund manager.

76.    The exceptional experience and reputation of Vanguard in the investment management industry is well documented. Founded on May 1, 1975,

_____

[6] Jeffrey Ptak, *Success Story: Target-Date Investors*, MORNINGSTAR (Feb. 19, 2018), https://www.morningstar.com/articles/850872/success-story-target-date-fund-investors.

Vanguard has offered investment products to investors for over 45 years.[7] Vanguard has offered target date funds since 2003[8] and lower-cost collective investment trust versions (I shares) since 2007.[9] Each year from 2012–2017, Vanguard received the highest Morningstar Analyst Rating for Target-Date Series mutual funds.[10]

77.    Vanguard has been the top target date fund provider (by assets under management) since 2014.[11] Since before 2016, Vanguard's target date mutual funds have been strong performing target date funds,[12] and the Vanguard collective investment trust versions have experienced even better performance because they charge lower fees than their mutual fund equivalents. Vanguard's percentile rankings reflect that consistently strong performance. Over the five-year period from 2011 through 2015, the Vanguard target date mutual funds ranked better than the median of their peer group, including in the top quartile in three of those five years.

78.    The Vanguard Target Retirement collective trust target date funds, which were available to the Plan, also provided additional fee savings relative to their mutual fund equivalents. Since 2016, the Vanguard Target Retirement Trust

---

[7] Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

[8] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.htm.

[9] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.htm; Vanguard Target Retirement 2020 Trust I Fact Sheet, https://institutional.vanguard.com/iippdf/pdfs/FS1464.pdf.

[10] John Croke, *Vanguard Earns Morningstar Gold,* June 21, 2019, https://institutional.vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/InvComVanguardMorningstarGold. Morningstar, Inc. is a leading provider of investment research and investment services, and is relied on by industry professionals.

[11] Morningstar, 2019 Target Date Fund Landscape, at 9, 11 https://institutional.vanguard.com/iam/pdf/TDFLNDSCP.pdf.

[12] *E.g.,* Morningstar, 2019 Target Date Fund Landscape at 33; Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

- 25 -

Plus shares charge 6–7 bps, and the lower-cost Trust Select shares charge 5 bps. The Trust Plus shares have been available since August 2011, while the Trust Select shares have been available since June 2015.

79.     Relative to the Trust Select Shares at the time the funds were added to the Plan, the flexPATH Index target date funds (I1 shares) charged 380% higher expenses—24 bps compared to 5 bps. Compared to the Plan's Vanguard target date mutual funds, the flexPATH Index target date funds were close to 50% more expensive—24 bps compared to 16–18 bps.[13] The Plan later transitioned to M shares for the flexPATH Index target date funds at or around December 2018. These shares were still more than twice the cost of the Vanguard collective trusts—12 bps compared to 5 bps.

80.     Presented with the consistent and strong performance of the Vanguard target date funds, coupled with lower investment management fees, a prudent fiduciary would not  have removed them from the Plan absent a compelling reason to do so after weighing all relevant factors. After weighing the relative merit of the Vanguard target date funds and the flexPATH Index target date funds, a prudent fiduciary would not have replaced the Vanguard funds in favor of flexPATH's untested and newly launched funds. Nor would a prudent and loyal fiduciary have presented the untested and newly launched flexPATH Index target date funds for consideration in the Plan.

81.     The above-referenced facts demonstrate that a prudent alternative to the flexPATH Index target date funds was the Vanguard Target Retirement Trust target date funds. From June 30, 2016 through September 30, 2020, the Plan's flexPATH target date funds substantially underperformed the Vanguard Target

---

[13] Vanguard Chester Funds, Form N-CSR, Sept. 30, 2015, https://www.sec.gov/Archives/edgar/data/752177/000093247115008529/chester_final.htm. Effective June 26, 2015, Vanguard introduced lower-cost target date mutual funds called the Vanguard Institutional Target Retirement Funds, which charged 10 bps. *See* Vanguard Chester Funds, Form N-CSR, Sept. 30, 2015, https://www.sec.gov/Archives/edgar/data/752177/000093247115008529/chester_final.htm.

- 26 -

Retirement Trust Select target date funds. Had Molina used the Vanguard alternative rather than the flexPATH Index target date funds, Plan participants would not have lost in excess of $12.9 million of their retirement savings.[14]

82.    In October 2020, Molina finally replaced the flexPATH Index target date funds with the Fidelity Freedom Index target date funds (Premier Class). Molina reached that decision only after it subjected Plan participants to an untested target date fund that put at risk hundreds of millions of dollars of participants' retirement savings. By replacing the flexPATH Index target date funds with the Fidelity Freedom Index target date funds, Molina recognized that Fidelity's target date funds were a prudent alternative to flexPATH's target date funds.

83.    Like Vanguard, Fidelity is an established and experienced investment manager of target date fund solutions. Fidelity has ranked second among top target date fund providers (by assets under management) since 2014.[15] Fidelity first offered target date funds to investors in 1996 when it launched its actively managed Fidelity Freedom target date funds.[16] In 2009, Fidelity launched its passively managed Fidelity Freedom Index target date funds, which were the funds later included in the Plan.[17] Over the five-year period from 2011 through 2015, the Fidelity Index target date mutual funds also ranked better than the median of their peer group on average.

84.    At the time the flexPATH Index target date funds (I1 shares) were added to the Plan, they charged 200% higher expenses—24 bps compared to 8 bps—relative to the Fidelity Freedom Index target date funds.[18] Even though the

---

[14] Plan losses have been brought forward to account for lost investment opportunity. Using the Vanguard Institutional Target Retirement mutual funds, Plan losses are in excess of $12.5 million.

[15] Morningstar, 2019 Target Date Fund Landscape, at 9, 11.

[16] Fidelity Aberdeen Street Trust, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/880195/000088019506000042/aberann.htm.

[17] Fidelity Aberdeen Street Trust, Form N-CSR, Mar. 31, 2015, https://www.sec.gov/Archives/edgar/data/880195/000087846715000371/main.htm.

[18] Fidelity Aberdeen Street Trust, Form N-CSR, Mar. 31 2015.

Plan later transitioned to M shares for the flexPATH Index target date funds, these shares were still 50% more expensive than the Fidelity Freedom Index target date funds (Institutional Premium Class)—12 bps compared to 8 bps.[19]

85.    The above-referenced facts demonstrate that the Fidelity Freedom Index target date funds were another prudent alternative to the flexPATH Index target date funds. From June 30, 2016 through September 30, 2020, the Plan's flexPATH target date funds substantially underperformed the Fidelity Freedom Index target date funds. Had Molina used the Fidelity alternative (as measured by the Institutional Premium Class) rather than the flexPATH Index target date funds, Plan participants would not have lost in excess of $19.7 million of their retirement savings.[20]

**II.    Defendants caused the Plan to pay unreasonable investment management fees by using higher-cost versions of Plan investments.**

86.    Plan expenses can "significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). "It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc). Due to the effect of compounding, even seemingly small fee differentials will significantly reduce a participant's account balance over time. *Id*. at 1191, 1198.

87.    In light of this pernicious effect of fees on participants' retirement savings, skilled and diligent fiduciaries understand the fundamental importance of expenses to investment selection and monitoring. Indeed, "the duty to avoid

---

[19] Fidelity Aberdeen Street Trust, Form N-CSR, Mar. 31 2019, https://www.sec.gov/Archives/edgar/data/880195/000137949119002596/filing717.htm. The Premier Class shares were launched in June 2020. *See* Fidelity Aberdeen Street Trust, Form N-CSR, Mar. 31, 2021, https://www.sec.gov/Archives/edgar/data/880195/000137949121002166/filing717.htm.

[20] Plan losses have been brought forward to account for lost investment opportunity. Institutional Premium Class shares were used for purposes of computing the Plan's losses.

- 28 -

unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. RESTATEMENT (THIRD) OF TRUSTS ch. 17, intro. note (2007); *see Tibble*, 575 U.S. at 528–29 ("In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts," and citing RESTATEMENT (THIRD) OF TRUSTS §90 in finding a continuing duty to monitor in case alleging imprudence in retaining higher-cost shares of plan investments). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." RESTATEMENT (THIRD) OF TRUSTS §90 cmt. b.

88.    Mutual funds and collective investment trusts frequently offer multiple share classes. The different share classes of a given mutual fund or collective trust have the identical manager, are managed identically, invest in the same portfolio of securities, and allocate their assets the same. The only difference is the fees charged; higher fees necessarily mean investors receive lower returns. The share classes are otherwise identical in all respects.

89.    Because the only difference between the share classes is fees, selecting higher-cost shares results in a plan paying wholly unnecessary fees. Accordingly, as a matter of practice, skilled and diligent fiduciaries investigate all available share classes of plan investment options, both during the initial selection of the option and on an ongoing basis. The different share classes of a given fund can be readily determined with minimal effort by consulting fund literature such as a prospectus or offering statement. Upon ascertaining the available share classes, skilled and diligent fiduciaries almost invariably select the lowest-cost share classes available to their plans.

90.    It is a simple principle of investment management that for any given fund, an investor with a larger amount of assets can obtain lower fees than a smaller investor. The market for retirement plan business is ultra-competitive, and investment managers will go to great lengths to win the business of a large

- 29 -

retirement plan. Adding such plans to the manager's client list is not only financially rewarding, it also carries reputational and marketing value.

91.    Mutual funds and collective trusts sometimes advertise minimum investment requirements for certain share classes. Large plans often easily clear these thresholds. To the extent a plan does not meet the advertised minimum, investment managers routinely waive the threshold upon request for plans for large defined contribution plans, which may help the manager obtain the plan as a client. *See Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010), *affirmed* 729 F.3d 1110 (9th Cir. 2013) (finding based on evidence at trial that "mutual funds will often waive an investment minimum for institutional share classes" for large 401(k) plans, and that "[i]t is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares"). Vanguard, for instance, expressly "reserves the right to establish higher or lower minimum amounts for certain investors."[21]

92.    As a matter of fiduciary practice, skilled and diligent fiduciaries of large defined contribution plans understand that their plans wield tremendous bargaining power. Such fiduciaries are aware that in a competitive market, managers will compete to win their plans' business and will waive advertised minimum investment requirements for particular share classes upon request. Such fiduciaries will not hesitate to request a waiver if needed, because doing so benefits participants by avoiding unnecessary fees that the plan would otherwise incur in a higher-cost share class.

93.    A prominent legal counsel to defined contribution fiduciaries corroborates that these are the practices of prudent fiduciaries:

> The fiduciaries also must consider the size and purchasing

---

[21] *See* Vanguard Funds Multiple Class Plan, https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multipleclassplanvanguardfun.pdf.

- 30 -

power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.[22]

94.     During the proposed class period, Molina had the fiduciary authority over the selection and retention of share classes used for the Plan's investments. Despite the fact that lower-cost shares for the exact same investment option were available to the Plan, Molina provided higher-cost shares for Plan investments than were available to the Plan based on its size. And NFP was charged with advising Molina on the use of share classes used for Plan investments.

95.     From May 16, 2016 through approximately December 31, 2018, Molina provided the flexPATH Index target date funds in "I1" shares even though lower-cost "R" shares were available since May 2, 2016. As of September 30, 2016, I1 shares charged approximately 24–25 bps when the lower-cost R shares charged 19–20 bps. Although Molina transitioned to the lower-cost M shares for the flexPATH Index target date funds by December 31, 2018, the M shares were available to the Plan since February 23, 2018.

96.     Apart from the flexPATH Index target date funds, Molina also maintained a number of mutual fund investments in higher-cost shares than were otherwise available to the Plan for the identical investment. The table set forth below summarizes those higher-cost funds.[23]

---

[22] Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR, Jan. 2011, http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

[23] Expense ratios obtained from Morningstar, a leading provider of investment research and investment services, and relied upon by industry professionals.

- 31 -

| Date | Mutual Fund | Plan Shares (Ticker) | Fee | Lower-Cost Shares (Ticker) | Fee | Inception Date[24] | Max. Excess Fees (%) |
|---|---|---|---|---|---|---|---|
| 2016 | American Funds New Perspective | R4 (RNPEX) | 81 bps | R6 (RNPGX) | 45 bps | 5/1/09 | 80% |
| 2017 | Fidelity 500 Index | Inst (FXSIX) | 4 bps | Adv Inst (FXAIX) | 2 bps | 5/4/2011 | 100% |
| 2018 – 2020 | Fidelity Low-Priced Stock | K (FLPKX) | 53–69 bps | K6 (FLKSX) | 50 bps | 5/26/17 | 38% |
| 2017 | Fidelity Mid Cap Index | Inst (FSTPX) | 6 bps | Adv Inst (FSMDX) | 4 bps | 9/8/2011 | 50% |
| 2016 – 2017 | Fidelity Spartan Int'l Index | Prem (FSIVX) | 9–12 bps | Adv Inst (FSPSX) | 5-6 bps | 9/8/2011 | 80% |

[24] *See* American Funds New Perspective Fund, Form 497K, Dec. 1, 2015, https://www.sec.gov/Archives/edgar/data/71516/000005193115001458/npf497k.htm; Fidelity Spartan 500 Index Fund, Form 497K, Jan. 13, 2017, https://www.sec.gov/Archives/edgar/data/819118/000137949117000123/filing192359564.htm; Fidelity Puritan Trust, Form N-CSR, July 31, 2017, https://www.sec.gov/Archives/edgar/data/81205/000137949117006219/filing977.htm#301512824; Fidelity Salem Street Trust, Form N-CSR, Apr. 30, 2016, https://www.sec.gov/Archives/edgar/data/35315/000137949116004583/filing836.htm#107550936; Fidelity Concord Street Trust, Form N-CSR, Feb. 28, 2015, https://www.sec.gov/Archives/edgar/data/819118/000136492415000136/Concord_1_main.htm#sii5685185; Fidelity Salem Street Trust, Form N-CSR, Aug. 31, 2015, https://www.sec.gov/Archives/edgar/data/35315/000088019515001173/Salem_main.htm#lig2210018; Janus Triton Fund, Form 497K, Apr. 27, 2015, https://www.sec.gov/Archives/edgar/data/277751/000095012315006605/d30892e497k.htm; JP Morgan Trust I, Form N-CSR, June 30, 2015, https://www.sec.gov/Archives/edgar/data/1217286/000119312515311589/d30925dncsr.htm#toc897800_12; MFS Series Trust I, Form N-CSR, Aug. 31, 2016, https://www.sec.gov/Archives/edgar/data/798244/000119312516747665/d211927dncsr.htm#tx211925_5; T. Rowe Price Blue Chip Growth Fund–I Class, Form 497K, Dec. 15, 2015, https://www.sec.gov/Archives/edgar/data/902259/000090225915000023/bcipta-may13.htm; Victory Portfolios, Form N-CSR, Oct. 31, 2016, https://www.sec.gov/Archives/edgar/data/802716/000110465916164438/a16-20736_4ncsr.htm.

- 32 -

| Date | Mutual Fund | Plan Shares (Ticker) | Fee | Lower-Cost Shares (Ticker) | Fee | Inception Date[24] | Max. Excess Fees (%) |
|---|---|---|---|---|---|---|---|
| 2016 | Fidelity Spartan U.S. Bond Index | Prem (FSITX) | 7 bps | Adv Inst (FXNAX) | 5 bps | 5/4/2011 | 40% |
| 2017 | Fidelity Spartan U.S. Bond Index | Inst (FXSTX) | 4 bps | Adv Inst (FXNAX) | 3 bps | 5/4/2011 | 33% |
| 2016 | Janus Triton | I (JSMGX) | 78 bps | N (JGMNX) | 68 bps | 5/31/12 | 15% |
| 2016 | JP Morgan U.S. Equity | I (JUESX) | 76 bps | R6 (JUEMX) | 50 bps | 11/30/10 | 52% |
| 2016 | MFS Value | R4 (MEIJX) | 61 bps | R6 (MEIKX) | 50 bps | 5/1/06 | 22% |
| 2016 | T. Rowe Price Blue Chip Growth | TRBCX | 72 bps | I (TBCIX) | 58 bps | 12/17/15 | 24% |
| 2018 – 2020 | Victory Small Company Opp. | I (VSOIX) | 88–93 bps | R6 (VSORX) | 86-87 bps | 12/14/15 | 6% |

97.     By providing Plan participants the more expensive share classes of Plan investment options, Molina caused participants to lose in excess of $1 million of their retirement savings.[25]

**CLASS ACTION ALLEGATIONS**

98.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching

---

[25] Plan losses have been carried forward using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets.

- 33 -

fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

99.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all Plan participants and beneficiaries. Plaintiffs seek to certify the follow class:

> All participants and beneficiaries of the Molina Healthcare Salary Savings Plan from March 18, 2016 through the date of judgment, excluding Defendants.

100.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.     The Class includes over 15,000 members and is so large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is

- 34 -

in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

101.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

102.   Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been

- 35 -

appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation.

103.   Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016). Chief Judge Michael J. Reagan of the Southern District of Illinois recognized that the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013) (emphasis added).

104.   Other courts have made similar findings. *See, e.g., Marshall v. Northrop Grumman Corp.*, No. 16-6794 AB (JCX), 2020 WL 5668935, at *4 (C.D. Cal. Sept. 18, 2020) ("The Court finds that Schlichter, Bogard & Denton is exceptionally skilled having achieved unparalleled success in actually pioneering complex ERISA 401(k) excessive fee litigation[.]"); *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020) (Schlichter, Bogard & Denton "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans"); *Bell v. Pension*

*Comm. of ATH Holding Co.,* No. 15-2062, 2019 WL 4193376, at \*2 (S.D. Ind. Sept. 4, 2019*)* (the firm are "experts in ERISA litigation"); *Spano v. Boeing Co.*, No. 06-743, Doc. 587, at 5–6 (S.D. Ill. Mar. 31, 2016) ("The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one[.]") (internal quotations omitted); *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432, at \*2 (S.D. Ill. Jan. 31, 2014) ("Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination."); *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487, at \*2 (N.D. Ill. June 26, 2012) ("It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area."); *Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174, at \*3 (S.D. Ill. Nov. 22, 2010) ("Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees.").

105.    Schlichter Bogard & Denton handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 5386033, at \*3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context

of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265, at *2 (W.D. Mo. Dec. 9, 2015).

106.    Schlichter Bogard & Denton was also class counsel in and handled *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id*. at 1829. Schlichter Bogard & Denton successfully petitioned for a writ of certiorari and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

## COUNT I: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO THE FLEXPATH INDEX TARGET DATE FUNDS

107.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

108.    This Count alleges breach of fiduciary duties against all Defendants.

109.    Defendants were required to act "solely in the interest" of participants and to manage the assets of the Plan for the "exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the Plan", and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims". 29 U.S.C. §1104(a)(1)(A)–(B). Defendants also were obligated to comply with the Plan's governing documents, including the IPS. 29

- 38 -

U.S.C. §1104(a)(1)(D).

110.   Defendants were directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets were invested prudently. As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 575 U.S. at 530.

111.   NFP breached its duty of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) and the Molina Defendants breached their duty of prudence under §1104(a)(1)(B) by causing the flexPATH Index target funds to be added and retained in the Plan. Defendants failed to engage in a reasoned decision-making process to determine that using the flexPATH Index target date funds was in the best interests of Plan participants or prudent and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. Defendants' decision to add and retain the flexPATH Index target date funds caused the Plan and participants to incur significant losses.

112.   Defendants also breached their duties under §1104(a)(1)(D) by violating the IPS by using the flexPATH Index target date funds. The IPS specified that the Investment Committee "will select" Plan investments based on certain criteria, which included "returns comparable to returns for similar investment options. For the Plan's QDIA, the investment selected should have investment performance "at least competitive with an appropriate style-specific benchmark and the median return for an appropriate, style-specific peer group," "risk-adjusted return measures should be evaluated by the [Investment] Committee and be within a reasonable range relative to appropriate, style-specific benchmark and peer group," and the "investment manager should demonstrate adherence to the stated investment objective," among other factors. Because the flexPATH Index target

- 39 -

date funds had no prior performance history, Molina's decision to include the flexPATH Index target date funds, and NFP's recommendation to consider those funds for the Plan, violated the terms of the IPS.

113. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

114. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

115. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO THE USE OF HIGHER-COST VERSIONS OF PLAN INVESTMENTS

116. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

117. This Count alleges breach of fiduciary duties against all Defendants.

118. As explained in detail above, the practice of skilled and diligent fiduciaries of billion-dollar defined contribution plans is to investigate the available share classes of a plan's investment options both when selecting the investment and periodically thereafter, and to use the lowest-cost share class available to the plan to avoid incurring wholly unnecessary fees.

119. In contrast to prudent fiduciary practice, Defendants selected and retained higher-cost shares of numerous Plan investment options, even though a

lower-cost share class of the same investment option with the identical investment manager and investment holdings was readily available to the Plan based on its size, which far exceeded $1 billion at all relevant times.  In so doing, Defendants breached their duty of prudence under 29 U.S.C. §1104(a)(1)(B).

120.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

121.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT III: FAILURE TO MONITOR FIDUCIARIES

122.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

123.   This Count is asserted against Molina Healthcare, Inc. and the Board of Directors of Molina Healthcare, Inc.

124.   Molina, acting through the Board, is the named fiduciary under 29 U.S.C. §1102(a) with overall responsibility for the control, management and administration of the Plan, and the Plan administrator under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their

- 41 -

retirement income. The Board delegated fiduciary responsibilities to the Investment Committee, and also had the authority to appoint or remove members of the Investment Committee, and determine the employees of Molina who would serve on the Investment Committee. Accordingly, Molina and the Board had the fiduciary responsibility to monitor the performance of the other fiduciaries, including those who may have been delegated fiduciary responsibility to administer and manage Plan assets.

125.   A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties. To the extent any of the fiduciary responsibilities of Molina were delegated to another fiduciary, Molina's monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

126.   Molina and the Board breached their fiduciary monitoring duties by, among other things:

    a.   failing to monitor their appointees and delegees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

    b.   failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

    c.   failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

- 42 -

d.  failing to remove appointees and delegees whose performance was inadequate in that they continued to allow unreasonable fees to be charged to Plan participants or imprudent investment options to be selected and retained in the Plan, all to the detriment of Plan participants' retirement savings.

127.  As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered substantial losses. Had Molina, the Board and the other delegating fiduciaries discharged their fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses.

## COUNT IV: PROHIBITED TRANSACTIONS (29 U.S.C. §1106) RELATED TO THE FLEXPATH INDEX TARGET DATE FUNDS

128.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

129.  This Count is asserted against all Defendants.

130.  Section 1106(b) prohibits transactions between a plan and a fiduciary. 29 U.S.C. §1106(b). NFP was a Plan fiduciary and advised Molina on the selection and retention of the flexPATH Index target date funds. NFP therefore dealt with the assets of the Plan in its own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for their own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

131.  Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. §1106(a). NFP was a party in interest because it was a Plan fiduciary and an entity that provided services to the Plan. 29 U.S.C. §1002(14)(A) and (B). Molina and NFP caused the Plan to use the flexPATH funds. Defendants therefore caused the Plan to engage in a transaction that they knew or should have

- 43 -

known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

132.   As a direct result of these prohibited transactions, Defendants caused the Plan to suffer losses.

133.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count and to restore to the Plan all profits through their use of Plan assets and is subject to other equitable or remedial relief as appropriate, including removal as a Plan fiduciary.

## JURY TRIAL DEMANDED

134.   Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;
- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position they would have occupied but for the breaches of fiduciary duty;
- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;
- order Defendants to provide all accountings necessary to determine

the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

July 21, 2022                         Respectfully submitted,

By: /s/ Jerome J. Schlichter
SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter (SBN 054513)
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
jschlichter@uselaws.com

*Counsel for Plaintiffs*

- 45 -

William H. Edmonson (SBN 243445)
*will@whelawfirm.com*
LAW OFFICE OF WILL EDMONSON
9157 Sunset Boulevard, Suite 213
West Hollywood, CA 90069
Telephone: (424) 248-9581

*Local Counsel for Plaintiffs*

- 46 -