UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MICHELLE MILLS et al., | Case No. 2:22-cv-01813-SB-GJS |
| Plaintiffs, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| MOLINA HEALTHCARE, INC. et al., | |
| Defendants. | |

Following the Court's orders granting in part Defendants' motions to dismiss and for summary judgment, Dkt. Nos. 123, 189, the Court held a six-day bench trial on the remaining claims, beginning on November 6 and ending on November 14, 2023. After evaluating the evidence at trial and considering the parties' written submissions, the Court issues the findings of fact and conclusions of law set forth below.[1]

## FINDINGS OF FACT

### Introduction

1.   This case is a class action alleging that Defendants breached their fiduciary duties and engaged in prohibited transactions in violation of the Employee Retirement Income Security Act of 1974 (ERISA).

2.   Plaintiffs were participants in the Molina Salary Savings Plan (the Plan), a defined-contribution, individual-account, employee pension plan that Defendant Molina Healthcare, Inc. (Molina) sponsors for its employees

---

[1] The characterization of a finding as one of "fact" or "law" is not controlling. To the extent that a finding is characterized as one of "law" but is more properly characterized as one of "fact" (or vice versa), substance shall prevail over form.

under the Employee Retirement Income Security Act of 1974.  Plaintiffs challenge the selection and retention of the flexPATH Index target date funds (TDFs) as the Plan's qualified default investment alternative (QDIA)—the investment that would be selected for a Plan member who did not choose a different option.

3.    Molina is the Plan's sponsor under 29 U.S.C. § 1102(a)(1) and the Plan's administrator under 29 U.S.C. § 1002(16).

4.    Named Plaintiffs Michelle Mills, Coy Sarell, Chad Westover, Brent Aleshire, Barbara Kershner, Paula Schaub, and Jennifer Silva were employed by Molina or its affiliates and invested in the flexPATH Index TDFs during the class period.

5.    On January 17, 2023, pursuant to the parties' stipulation, the Court certified a class consisting of all participants of the Molina Salary Savings Plan from March 18, 2016 through October 26, 2020 (the Class Period) who invested in a flexPATH Index TDF through an individual Plan account, and their beneficiaries, excluding Defendants.  Dkt. No. 127.

<u>The Molina Defendants</u>

6.    Molina provides managed health care services under Medicare and Medicaid and through state insurance programs.

7.    Molina established the Plan through a written plan document, a version of which was in effect during the Class Period.

8.    Defendant Molina Salary Savings Plan Investment Committee (the Committee) is a committee within Molina charged with overseeing the Plan.

9.    Defendant the Board of Directors of Molina (the Board) established the Committee and appointed its members.

10.   The Board adopted an Investment Committee Charter that was in effect at the start of the Class Period and that was later amended during the Class Period.  The charter required the Committee to follow the policies and procedures in the Plan's Investment Policy Statement (the IPS), to hold regular meetings, and report at least annually to the Board.

11.   At all relevant times, the Committee held meetings on at least a quarterly basis.

12.    The Committee's members for the most part had no special expertise in finance or investment and were primarily focused on other job responsibilities.  At least one member typically did not even read the materials that were distributed in advance of the quarterly meetings.  At trial, most former Committee members who testified could not remember basic information about what they were told or the decisions they made.  The Court concludes that their lack of recollection is attributable in part to the passage of time but also that most members lacked a deep understanding of the Plan's investments.  Based on the testimony at trial, the Committee members' level of engagement and lack of expertise appears to be within the normal range for similar committees overseeing ERISA plans in other companies that worked with investment advisors.

13.    The Court finds that the Committee's members acted in good faith but largely deferred to the advice and guidance of their investment advisors.

### The IPS

14.    The Committee adopted an IPS that was operative during the Class Period.  The IPS provided criteria for selecting and monitoring Plan investment options.  The Committee's members understood that the IPS provided the framework for their decision-making and that they were required to adhere to the IPS.

15.    The IPS provided that "[t]he selection of investment options offered under the Plan is among the Committee's most important responsibilities."

16.    The IPS required the Committee to select an investment or set of investments to serve as the QDIA—the designated investment into which all funds not directed elsewhere would be invested.

17.    The IPS directed that all investment options included in the Plan's menu should meet certain standards for selection, including that "[i]nvestment performance should be at least competitive with an appropriate style-specific benchmark and the median return for an appropriate, style-specific peer group (where appropriate and available, long-term performance of an investment manager may be inferred through the performance of another investment with similar style attributes managed by such investment manager)."

18.   The IPS also required that "[s]pecific risk and risk-adjusted return measures should be reviewed by the Committee and be within a reasonable range relative to appropriate, style-specific benchmark and peer group."

19.   The Committee was required to monitor investments on an ongoing basis, although the IPS stated that "[f]requent change of investments is neither expected nor desired."

20.   The IPS provided for the maintenance of "scorecards" to monitor performance history.  Funds were to be scored on a scale of 0 to 10, with 80 percent of the score based on quantitative factors and 20 percent based on qualitative factors.  Funds that scored below 7 out of 10 would be placed on a watch list.  The IPS directed that a fund that remained on the watch list for four consecutive quarters or five out of eight consecutive quarters should be considered for possible removal.

<u>NFP Retirement, Inc. and flexPATH Strategies, LLC</u>

21.   NFP Retirement, Inc., f/k/a 401(k) Advisors, Inc. (NFP), a subsidiary of NFP Corporation (NFP Corp.), is a registered investment advisor that provides retirement plan consulting, investment advice and fiduciary due diligence services, employee plan and investment education, asset allocation services, and plan service provider research and analysis.

22.   Molina signed an Investment Advisory Agreement (IAA) with NFP, then named 401(k) Advisors, on March 1, 2010.

23.   Pursuant to the IAA, NFP became the Plan's investment consultant under § 3(21) of ERISA, 29 U.S.C. § 1002(21)(A)(ii).  As a 3(21) investment advisor, NFP was a fiduciary who rendered investment advice to the Plan for a fee but did not have authority to manage, acquire, or dispose of assets.

24.   From July 1, 2016 through June 30, 2020 (a span covering most of the Class Period), the Plan paid NFP $509,917 pursuant to the terms of the IAA.

25.   Solomon Stewart and Veronica Lee were NFP's investment consultants assigned to advise the Plan.  Stewart and Lee replaced previous consultants in 2014 and attended Committee meetings from then until NFP was replaced as the Plan's investment consultant in 2020.

26.   Defendant flexPATH Strategies, LLC (flexPATH) is a registered investment advisor.  flexPATH registered with the Securities and Exchange Commission in February 2015.

27.   During the Class Period, flexPATH offered delegated fiduciary services to corporate retirement plans under § 3(38) of ERISA, 29 U.S.C. § 1002(38).  A 3(38) investment manager is a fiduciary who, among other things, has authority to manage, acquire, or dispose of plan assets.

28.   On March 31, 2016, Molina signed the Investment Manager Agreement (IMA) for flexPATH to serve as the 3(38) investment manager to the Plan for purposes of selecting and monitoring the Plan's QDIA.  flexPATH signed the IMA the next day.

29.   flexPATH and NFP are closely related.  Vincent Giovinazzo was the Chief Executive Officer of NFP and flexPATH.  Nicholas Della Vedova was the President of NFP and flexPATH.  Jeffrey Elvander was the Chief Investment Officer of NFP and flexPATH.  Joel Shapiro was Senior Vice President of both NFP and flexPATH.

30.   Giovinazzo founded NFP in 2000 and developed the business together with Della Vedova.  Giovinazzo, Della Vedova, and Elvander founded flexPATH in 2014 to complement their work at NFP.

31.   flexPATH and NFP operated out of the same office in Aliso Viejo, California.

32.   As of February 2014, Giovinazzo owned 27.78% of flexPATH, Della Vedova owned 22.22% of flexPATH, and NFP Corp. owned 50% of flexPATH.

The flexPATH Target Date Funds

33.   TDFs are designed to offer a diversified option for investors who do not want to manage the allocation of their investment portfolio over time.  TDF suites typically consist of a series of diversified investment vehicles that correspond to different target retirement years (e.g., 2030) with asset allocations that adjust as the target retirement date approaches.  A TDF will begin with more aggressive, riskier investments and gradually shift to more conservative funds as the target date approaches.

34. A "glidepath" refers to how a TDF's asset allocations among a mix of investments—such as stocks, bonds, and cash equivalents—change over time. Glidepaths may be "to retirement," meaning the composition of the fund becomes more conservative until the target date and then remains static, or "through retirement," meaning the TDF continues to adjust its asset allocation after the target date.

35. The flexPATH Index Target-Date Funds (the flexPATH TDFs) are collective investment trusts (CITs) that invest in underlying funds and follow a to-retirement glidepath. During the Class Period, the flexPATH TDFs were maintained by Wilmington Trust, N.A. (Wilmington Trust).

36. flexPATH first made the flexPATH TDFs available to investors in December 2015, and all vintages were made available to investors by January 2016.

37. The flexPATH TDFs offered vintages in ten-year increments: 2025, 2035, 2045, and 2055.

38. Each ten-year vintage of the flexPATH TDFs offered three glidepaths— conservative, moderate, and aggressive—to accommodate investors' varying risk tolerances.

39. Through a partnership with BlackRock, the flexPATH TDFs invested in underlying TDFs offered and managed by BlackRock. The flexPATH Index Moderate TDF invested 100 percent in the corresponding vintage of the BlackRock LifePath Index TDF. The flexPATH Index Aggressive TDF invested in one or more BlackRock LifePath Index TDFs. The flexPATH Index Conservative TDF invested in the corresponding vintage of the BlackRock LifePath Conservative TDF, which invested in BlackRock LifePath Index TDFs.

## Molina's Decision to Adopt the flexPATH TDFs as the Plan's QDIA

40. In 2014 and 2015, the Plan's QDIA was the Vanguard Target Retirement Funds (Vanguard TDFs). NFP classified the Vanguard TDFs as aggressive based on their relatively high equity allocation at retirement.

41. In part because of Vanguard's practice of regularly rotating lead portfolio managers, the Vanguard TDFs received scores that caused it to be placed on the Plan's watch list for most of 2013 and 2014.

42.  NFP's Stewart and Lee not only attended all meetings of the Committee; they also prepared the minutes and other materials for the meetings.

43.  At the November 2014 quarterly meeting of the Committee, Lee and Stewart introduced the Committee to the flexPATH TDFs, which at the time were still in development.  The meeting minutes prepared by NFP emphasize the benefits of the flexPATH TDFs, although NFP avoided characterizing its presentation as a recommendation:

> NFP Retirement introduced the Committee to a custom target date fund solution called FlexPATH Strategies.  The series provides three different risk levels that participants can choose from rather than a single glidepath option in most target date funds.  This allows participants to customize both their expected retirement date and level of risk.  The FlexPATH funds are available in either Index or Index+ versions and the underlying manager selection is overseen by NFP Retirement, providing for a multi-manager, open architecture approach.  The Committee agreed to maintain the existing target date funds for now, but continue to evaluate the options available to the plan.

44.  Stewart testified that he disclosed to the Committee the relationship between flexPATH and NFP.  To the extent he did so, he did not emphasize the closeness of the relationship or the conflict of interest inherent in any recommendation of flexPATH by NFP.  NFP did not make the Committee aware, for example, that flexPATH and NFP were owned and managed by the same people and worked out of the same office.

45.  flexPATH benefited from obtaining new clients and having a larger sum of assets under management, as well as from having more funds invested in its TDFs.  Because flexPATH was owned by NFP Corp. and NFP's principals, NFP was also incentivized to increase flexPATH's business.

46.  NFP recognized the inherent conflict of interest in promoting the flexPATH TDFs to its clients.  In an internal January 6, 2015 email, Giovinazzo noted that "[t]here are inherent potential conflicts of interest (again potential) that exist within flexPATH, including . . . NFP Retirement adding flexPATH to our clients."

47.     Nevertheless, NFP and flexPATH wanted to obtain more clients for flexPATH, and it made the flexPATH TDFs available to NFP's investment consulting clients and members of Retirement Plan Advisory Group (RPAG), a subsidiary of NFP Corp.  To mitigate conflicts, flexPATH created a separate share class for NFP clients to remove fees that would otherwise be paid to flexPATH, and RPAG instructed that investment advisors could not "[r]ecommend flexPATH Strategies or the flexPATH CITs to existing clients."

48.     On the other hand, NFP created an incentive program in which investment advisors would receive additional compensation when flexPATH was implemented into one of their client plans.  Although this incentive program had not been finalized when Molina adopted the flexPATH TDFs, Lee and Stewart later received thousands of dollars in extra compensation as a result of the Plan's adoption of the flexPATH TDFs.

49.     Following NFP's initial presentation about the flexPATH TDFs at the November 2014 meeting, it raised the issue again at the June 2015 Committee meeting.  This time, NFP gave a marketing presentation for the flexPATH TDFs, which presented them as the latest stage in the evolution of TDFs and contrasted them with the drawbacks of other types of TDFs, as shown in the following graphic that was part of the presentation:



50. NFP reintroduced the flexPATH TDFs again at the September 2015 Committee meeting and stated in the minutes that "[i]t seems prudent to re-evaluate the most appropriate level of risk in the plan's QDIA glidepath" and that NFP would prepare an analysis of "both off-the-shelf target date funds as well as flexPATH as a custom solution."

51. At the next Committee meeting, on November 19, 2015, Stewart and Lee presented a "TDF Fit Analysis" and suggested adoption of flexPATH as the Plan's QDIA. The Committee followed this advice and agreed to remove the Vanguard TDFs as the Plan's QDIA and replace them with the flexPATH TDFs, with the moderate glidepath as the default.

52. At trial, Stewart and Lee testified that they did not recommend adoption of the flexPATH TDFs and characterized their role as merely providing information. But their own notes, which they prepared and reviewed shortly after the meeting, state that the Committee decided to add the flexPATH TDFs "[o]n the recommendation of NFP Retirement." Moreover, their repeated presentations to the Committee about the flexPATH TDFs, including marketing materials that portrayed the flexPATH TDFs as an improvement over all other TDFs on the market, at four consecutive meetings—until the Committee finally agreed to adopt the flexPATH TDFs—go well beyond disinterested provision of information to the Committee. On this record, it is clear that Lee and Stewart intended to persuade the Committee to adopt the flexPATH TDFs as the Plan's QDIA, and that they succeeded in doing so (and were later compensated for that success).

53. NFP's self-interested promotion of the flexPATH TDFs raises concerns. However, because NFP is no longer a defendant in this case, the Court need not determine whether its conduct breached the duty of loyalty that it owed to Molina.[2]

_____

[2] After the conclusion of the bench trial in this case, another judge in this district issued findings of fact and conclusions of law in a different ERISA case challenging the adoption of the flexPATH TDFs as the QDIA for a different plan. See *Lauderdale v. NFP Ret., Inc.*, No. 8:21-CV-00301-JVS, 2024 WL 751005 (C.D. Cal. Feb. 23, 2024) (Selna, J.). Judge Selna found no breaches of fiduciary duty or prohibited transactions. *Id*. at *1. His findings are based on the evidence presented at the bench trial before him. With respect to the duty of loyalty, the facts in *Lauderdale* differed in significant respects from the facts here. The plan in

## Adoption of the flexPATH TDFs

54.  After the Committee decided to adopt the flexPATH TDFs as the Plan's QDIA, there were several steps required to implement that change, which was not effective until several months into 2016.

55.  On March 31, 2016, Molina signed the IMA appointing flexPATH to serve as the 3(38) investment manager.  flexPATH signed the IMA the next day.

56.  As a formal matter, the IMA delegated to flexPATH authority to select the Plan's QDIA.  Defendants contend that flexPATH conducted an independent evaluation, determined that the flexPATH TDFs were the best option for the Plan, and selected the flexPATH TDFs as the Plan's QDIA.  However, the documentation purporting to support that analysis does not identify who made the decision or when it was made, and none of the witnesses at trial were involved in any such evaluation by flexPATH or knew of someone else within flexPATH who had engaged in any independent determination that the flexPATH TDFs best fit Molina's needs.

57.  As a practical matter, Molina's decision to adopt the flexPATH TDFs as the Plan's QDIA resulted in the hiring of flexPATH as the Plan's 3(38) investment manager, which in turn led inevitably to the selection by flexPATH of its own TDFs.  There is no record in any of the Committee's minutes of a separate decision-making process by the Committee to hire flexPATH, and some of the Committee's members did not even remember or understand that flexPATH was a separate entity distinct from the TDFs. Moreover, the testimony at trial established that in every instance in which an NFP client adopted the flexPATH TDFs, it hired flexPATH as a 3(38) manager, and every time flexPATH has been hired as a 3(38) manager, it has determined that its own funds are the best fit for the plan.

---

*Lauderdale* selected NFP and flexPATH at the same time through a request for proposals after retaining an independent advisor.  When it did so, the plan understood that NFP and flexPATH "were 'basically the same' and 'joined at the hip,'" and it "hired NFP in part because of its ability to offer the flexPATH TDFs through flexPATH."  *Id*. at *10–11.  Thus, it does not appear that NFP promoted flexPATH to the plan while serving as a plan fiduciary with a duty to act only in the plan's interest, nor that there was any failure by NFP to adequately disclose its close relationship to flexPATH in *Lauderdale*.

58.  On March 31, 2016, the same day it signed the IMA, the Molina Committee took another step toward adopting the flexPATH TDFs when it entered into a Participation Agreement with Wilmington Trust, which caused the Plan to "become a Participating Plan (as such term is defined in the Trust) in the Trust." The Participation Agreement authorized Wilmington Trust to pay flexPATH 10 basis points from the flexPATH TDFs.

59.  On April 5, 2016, Molina sent Fidelity Investments (the Plan's recordkeeper) a letter of direction instructing it to replace the Vanguard TDFs with the flexPATH TDFs on the Plan's investment menu.

60.  In April 2016, a communication from Fidelity Investments notified Plan participants of forthcoming changes to the Plan's investment lineup. This included replacing the Vanguard TDFs with the flexPATH TDFs. Participants were given an opportunity to submit a new fund selection prior to May 16, 2016, when all existing balances were to be transferred to the new funds if participants did not elect otherwise.

61.  On May 16, 2016, the Plan's assets invested in the Vanguard TDFs were transferred to the flexPATH TDFs.

62.  Ultimately, more than half of the Plan's investments were transferred into the flexPATH TDFs. The vast majority of this money—between 96 and 99 percent—was invested in the moderate TDFs.

### Replacement of NFP and flexPATH

63.  Through February 2020, the Molina Committee continued to meet quarterly and to receive scorecards from NFP. flexPATH did not separately send representatives to the Committee meetings.

64.  Because the flexPATH TDFs were brand new when added to the Plan, they lacked the five-year history typically used to evaluate performance. Thus, the scorecards the Committee reviewed, both initially and throughout the time the flexPATH TDFs were in the Plan, did not contain scores for the flexPATH TDFs themselves, but rather relied on scores of the underlying funds in which the flexPATH TDFs invested.

65.  Eventually, in late 2019, Molina sent a request for proposals (RFP) for investment advisory services to seven companies.

66. Five companies returned an RFP response in February 2020. Multiple companies recommended replacement of the flexPATH TDFs.

67. In April 2020, the Committee decided to replace NFP with SageView Advisory Group as the Plan's 3(21) investment advisor.

68. Molina and SageView entered into a Master Services Agreement for investment advisory services effective May 1, 2020, and Molina notified NFP on June 8, 2020 that Molina was terminating its IAA with NFP effective June 30, 2020.

69. In August 2020, SageView recommended that the flexPATH TDFs be replaced with the Fidelity Freedom Index Premier Suite. The Committee approved the fund changes on August 25, 2020.

70. On September 1, 2020, Molina appointed SageView as the 3(38) investment manager for the Plan's TDFs, effective August 18, 2020.

71. The Fidelity Freedom Index TDFs were added to the Plan on October 26, 2020, and all assets in the flexPATH TDFs were transitioned to the new Fidelity Freedom Index TDFs.

72. For its services as a 3(38) investment manager during the time the flexPATH TDFs were the Plan's QDIA, flexPATH was paid approximately $543,000. This payment was for flexPATH's fees as a 3(38) investment manager and was owed to flexPATH regardless of whether the flexPATH TDFs remained in the Plan's investment options.

<u>Litigation History</u>

73. On March 18, 2022, Plaintiffs filed this putative class action alleging ERISA claims against Molina. Dkt. No. 1.

74. On July 21, 2022, after Molina moved to dismiss the complaint, Plaintiffs filed a First Amended Complaint (FAC) that added claims against the other Molina Defendants and NFP. Dkt. No. 43.

75. Defendants moved to dismiss the FAC, and on September 9, 2022, Plaintiffs filed the Second Amended Complaint (SAC), adding claims against flexPATH. Dkt. No. 79.

76.   The Court granted in part Defendants' motions to dismiss the SAC and motion for summary judgment, dismissing all claims against NFP and some claims against the remaining defendants.  Dkt. Nos. 123, 189.

77.   After the Court's rulings, the following claims in the SAC remained for trial: Count 1, alleging that the Molina Defendants breached their fiduciary duty of prudence and flexPATH breached its fiduciary duties of prudence and loyalty by causing the causing the flexPATH TDFs to be added and retained in the Plan; Count 3, alleging that Molina and the Board failed to monitor their delegated fiduciaries; and Count 4, alleging that the Molina Defendants engaged in prohibited transactions in violation of 29 U.S.C. § 1106(a)(1)(A), (C), and (D), and that flexPATH engaged in prohibited transactions in violation of § 1106(a)(1)(D) and § 1106(b)(1)–(2) when they caused the Plan to use the flexPATH TDFs.

78.   Pursuant to a stipulated motion, the Court certified a class of "[a]ll participants of the Molina Salary Savings Plan from March 18, 2016 through October 26, 2020 who invested in a flexPATH Index target date fund through an individual Plan account, and their beneficiaries, excluding Defendants."  Dkt. No. 127.

<u>Loss Experts</u>

79.   At trial, the parties offered competing expert opinions on the loss, if any, caused by Defendants' selection of the flexPATH TDFs as the Plan's QDIA.

80.   Defendants' expert Dr. John Chalmers compared the returns of the flexPATH TDFs during the Class Period to the median among all other to-retirement TDFs and also to three indices—the Dow Jones Target Date Total Return Index, the S&P Target Date Total Return Index, and the S&P Target Date To Retirement Index.

81.   For every vintage, the aggressive and moderate flexPATH TDFs outperformed the median to-retirement TDFs, while the conservative flexPATH TDFs generally underperformed the median.  Because the overwhelming majority (between 96% and 99%) of the Plan's funds invested in the flexPATH TDFs were invested in the high-performing moderate funds, the Plan's investment in the flexPATH TDFs obtained greater returns during the Class Period than did the median to-retirement TDF in the market.

82.   Dr. Chalmers's comparison of the flexPATH TDFs to the three indices he selected shows a similar pattern of strong performance.  For every vintage, the aggressive and moderate flexPATH TDFs outperformed at least two of the three indices.  For the 2035 vintage, the aggressive and moderate flexPATH TDFs outperformed all three indices, and for the 2055 vintage, all three flexPATH TDFs outperformed all three indices.  For the 2025 vintage, the S&P Target Date Total Return Index slightly outperformed the moderate flexPATH TDFs (7.17% annualized cumulative return versus 7.10%).  For the 2045 vintage, the Dow Jones Target Date Total Return Index—which in all other vintages underperformed both the aggressive and moderate flexPATH TDFs—slightly outperformed both (8.72% annualized cumulative return versus 8.71% and 8.65%).

83.   Dr. Chalmers calculated that, over the Class Period, the Plan's investment in the flexPATH TDFs earned more than each of the three indices:  $8,485,915 more than the Dow Jones Target Date Total Return Index, $3,276,260 more than the S&P Target Date Total Return Index, and $9,709,591 more than the S&P Target Date To Retirement Index.

84.   Thus, if any of the three indices identified by Dr. Chalmers is the appropriate comparator, the Plan suffered no loss as a result of the selection or retention of the flexPATH TDFs.

85.   Taking a different approach, Plaintiffs' expert Dr. Gerald Buetow identified four other investment options that he determined were alternatives a prudent fiduciary would have selected as the Plan's QDIA instead of the flexPATH TDFs:  TDFs offered by American Funds, T. Rowe Price, State Street, and Vanguard.  The Vanguard TDFs are the same funds that were replaced by the flexPATH TDFs as the Plan's QDIA.

86.   The four funds selected by Dr. Buetow as comparators outperformed both the market and the flexPATH TDFs during the Class Period.  Dr. Buetow was aware before selecting the comparator funds that they had performed extraordinarily well during the Class Period, but he opines that a prudent and loyal fiduciary would have selected them ex ante without the benefit of Dr. Buetow's knowledge of their actual performance.  Dr. Buetow testified that he attempted not to let his knowledge of their actual returns influence him when performing his analysis, but he acknowledged that it was difficult to do so.

87. Plaintiffs' expert Dr. Brian Becker calculated the difference in investment returns between the flexPATH TDFs and the four comparator TDFs identified by Dr. Buetow from May 16, 2016 through October 26, 2020, with losses brought forward through August 31, 2023, to account for lost investment opportunity.  Based on that comparison, he calculated the Plan's net losses from investing in the flexPATH TDFs relative to each of the other plans as follows:

| Comparator TDF | Net Losses |
|---|---|
| American Funds | $28,079,430 |
| T. Rowe Price | $22,748,128 |
| State Street | $17,057,559 |
| Vanguard | $9,790,540 |

88. Dr. Becker did not independently determine that the four comparator TDFs selected by Dr. Buetow were prudent alternatives that a prudent fiduciary would have selected as the Plan's QDIA.  Dr. Becker merely calculated losses on the assumption that the other TDFs were appropriate comparators.

### Appropriate Comparators and *Daubert* Motions

89. Plaintiffs do not challenge the accuracy of Dr. Chalmers's calculations, and Defendants do not challenge the accuracy of Dr. Becker's calculations.  The parties' dispute instead focuses on which expert used appropriate comparators to calculate the amount of any losses to the Plan.

90. Defendants move to exclude as unreliable Dr. Buetow's opinion that a prudent and loyal fiduciary would have favored the TDFs offered by American Funds, T. Rowe Price, State Street, and Vanguard.[3]  Dkt. No. 218. Relatedly, they move to exclude Dr. Becker's loss calculations because they

---

[3] The Court assumes without deciding that individual funds rather than market indices may under some circumstances be legally permissible comparators for purposes of determining whether a fiduciary breach caused a loss and calculating the amount of such loss.

are predicated on Dr. Buetow's selection of the comparator funds.  Dkt. No. 217.

91. Dr. Buetow testified that he employed quantitative analysis to select his comparator funds based on information that was available to a reasonable investor ex ante.  Dr. Buetow began by collecting the available TDFs that had at least a five-year performance history as of September 2015.[4]  He identified 24 TDFs available to mutual funds and 19 TDFs available to CITs. He then generated a composite score for each TDF based on a combination of eight measures of performance:  four based on a five-year history and four based on a three-year history.

92. Investment professionals frequently use composite scores based on similar performance metrics to evaluate the performance history of an investment. The precise formula Dr. Buetow used, however, is his own, and he is not aware of anyone else who uses exactly the same methodology for calculating composite scores.

93. Dr. Buetow assumed that a higher composite score reflecting stronger past performance is predictive of future performance, but he conducted no investigation whether his composite scores actually correlated with performance.

94. Dr. Buetow did not select as comparator TDFs the funds that received the highest composite scores based on his quantitative analysis.  Instead, he considered several factors he identified as "qualitative" before selecting four comparator TDFs in what he claimed was an exercise of his professional judgment.  In making these selections, Dr. Buetow chose funds that he knew had actually performed well during the Class Period over funds that received

---

[4] Dr. Buetow used information available as of September 30, 2015 to conduct his analysis.  This approach appears to assume that the relevant time for determining what investment opportunity a reasonable fiduciary would select was in the fall of 2015, when Molina first decided to replace the Plan's QDIA with the flexPATH TDFs.  Any decisions made in the fall of 2015 are outside the statute of repose. Dr. Buetow does not appear to have conducted a similar analysis based on the information available to a reasonable fiduciary within the repose period (i.e., in the spring of 2016 or later).  However, Defendants have not objected to his analysis on that basis, and the Court assumes that any differences in Dr. Buetow's analysis based on the changed date would be immaterial.

higher quantitative scores based on the performance history available in 2015 but that Dr. Buetow knew had ultimately performed more poorly during the Class.  Indeed, some of the funds Dr. Buetow selected as comparators had below-average composite scores based on the information available in September 2015.

95.  Dr. Buetow's explanations for not selecting as comparators some of the funds that received higher composite scores are unpersuasive.  For example, Dr. Buetow stated that he did not use the top-scoring fund (Putnam) in part because it was labeled as a sustainable fund, even though only the mutual fund version of the TDF included that word, and it was added in 2022, well after the Class Period.[5]  Dr. Buetow's stated reason for not selecting the top-scoring fund as an option that a prudent investor would have chosen in 2015 was therefore based in part on information that no prudent investor could possibly have considered in 2015 (or at any time during the Class Period).

96.  Two of the comparator TDFs Dr. Buetow selected—those offered by American Funds and T. Rowe Price—rely primarily on actively managed underlying funds.  The Molina Committee, however, expressed a strong preference for a TDF that relied on passively managed funds.  Dr. Buetow's suggestion that the Committee would have selected American Funds or T. Rowe Price in the absence of a fiduciary breach is entirely speculative and unmoored from the Committee's stated preferences.

97.  The Vanguard TDFs that were replaced as the QDIA scored poorly on Dr. Buetow's composite scoring rubric.  In its quarterly meetings, the Committee repeatedly received scorecards placing the Vanguard TDFs on a watchlist.  While NFP may have been incentivized to overstate the weakness of the Vanguard funds to increase the likelihood that the Committee would select the flexPATH Funds as a replacement, the scorecards were based largely on objective data.  Moreover, the Committee wanted to replace the Vanguard TDFs because it believed the Vanguard TDFs were too aggressive.  Even apart from the Committee's subjective preferences, which may have been influenced by NFP's salesmanship, there were reasons to be concerned about the Vanguard TDFs based on both the information in the

---

[5] Dr. Buetow testified that he also did not select Putnam because he knew that Putnam (like other funds he identified) had faced legal issues between 2004 and 2008.  On cross-examination, he acknowledged that he had not mentioned these issues in his expert report.

scorecards presented to the Committee and the publicly available information used by Dr. Buetow to generate his scoring rubric. Accordingly, the Court cannot assume that a prudent fiduciary would have retained the Vanguard TDFs as the Plan's QDIA throughout the Class Period.[6]

98.   The Court finds Dr. Buetow's explanations for the funds he selected as comparators to be unreliable.  Dr. Buetow appears to have been influenced in his selection of comparators by his knowledge of how the funds actually performed during the Class Period, leading to his choice of the best performers as comparators.  The flaws in his methodology—such as ignoring the fund with the highest quantitative score based in part on information that did not exist in 2015—are more readily explainable as the product of result-oriented analysis than as human error.  This impression is consistent with Dr. Buetow's testimony at trial, which not only highlighted the implausibility of some of his justifications for selecting or not selecting certain comparators, but also veered into what appeared to be advocacy at times.

99.   In sum, the Court finds it speculative, at best, to conclude that prudent, loyal fiduciaries in 2015 would have selected as the Plan's QDIA the TDFs

---

[6] Addressing Defendants' summary judgment argument that Plaintiffs had merely cherry-picked comparators that in hindsight outperformed the flexPATH TDFs, the Court stated, "it is not clear that [Plaintiffs] have done so here.  In particular, a reasonable factfinder might conclude that Plaintiffs' evidence that the flexPATH TDFs underperformed the Vanguard TDFs they replaced provides a nonspeculative basis for calculating damages based on the profits the Plan would have obtained if Defendants had not switched to the flexPATH TDFs."  Dkt. No. 189 at 15–16. The Court also noted that "Defendants cite no cases holding that a plaintiff alleging the imprudent replacement of one fund with another fund cannot use the performance of the replaced fund as a measure of loss resulting from the breach." *Id*. at 16 n.10.  After reviewing the full trial record and applicable law, it does not appear—at least under the circumstances present here—that the Court can assume that a prudent investor would have retained for years a fund that scored poorly on both the scorecards presented to the Committee and the composite score prepared by Dr. Buetow based on publicly available information, simply because it was the status quo.  Such inaction may be consistent with human nature (and therefore nonspeculative in one sense), but it is not consistent with prudence.  The Court did not intend to suggest otherwise in its summary judgment ruling.

offered by American Funds, T. Rowe Price, State Street, or Vanguard instead of the flexPATH TDFs (or other TDFs that scored higher on Dr. Buetow's quantitative analysis).  Plaintiffs have not shown that the funds suggested by Dr. Buetow are appropriate comparators for evaluating whether any fiduciary breaches in selecting or retaining the flexPATH TDFs caused losses to the Plan.  *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 34 (1st Cir. 2018) (whether expert picked suitable comparators for loss calculation is a question of fact).

100. In contrast, the Court finds the opinions rendered by Dr. Chalmers to be persuasive.  The indices he selected provide appropriate comparators for assessing whether the selection and retention of the flexPATH TDFs caused losses to the Plan.  Indeed, Dr. Buetow's own report used the S&P Target Date Index series as the benchmark for the performance of the TDFs he evaluated, and Plaintiffs' Second Amended Complaint uses it as a benchmark for the flexPATH TDFs.  Dkt. No. 79 ¶ 105; *see also id*. ¶ 105 n. 22 ("The S&P Target Date Fund benchmark is used by Morningstar and the Plan's current investment consultant (SageView) to benchmark target date fund strategies.  Morningstar, a leading provider of investment research and investment services, is relied upon by industry professionals.").  The Dow Jones Target Benchmark Index is also identified in Plan disclosures as a benchmark for the flexPATH TDFs.

101. Because the Court finds Dr. Buetow's selection of comparators unpersuasive and does not rely on it (or on Dr. Becker's calculations using those comparators), it is unnecessary to decide whether Dr. Buetow's opinion is so unreliable that it should be excluded under *Daubert*.[7]  Instead, the Court rejects his opinions in its role as a fact finder.

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

1. Plaintiffs' claims all arise under ERISA, a federal statute.  The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

---

[7] Defendants' *Daubert* motions are therefore DENIED as moot.

2.   Defendants have appeared and have not disputed that they are subject to personal jurisdiction.

3.   Venue is proper to 29 U.S.C. § 1132(e)(2) because the Plan was administered in this district and at least one defendant resides in this district.

Fiduciary Duties

4.   Defendants are all undisputedly fiduciaries for purposes of ERISA.

5.   ERISA imposes three duties on fiduciaries that Plaintiffs invoke in this case. First, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of:  (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).  This duty of loyalty prohibits fiduciaries from "engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between [their] fiduciary duties and personal interests.'"  *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1069 (N.D. Cal. 2017) (quoting Restatement (Third) of Trusts § 78 (2007)).  "When it is possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries."  *Howard v. Shay*, 100 F.3d 1484, 1488–89 (9th Cir. 1996) (cleaned up).

6.   Second, ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B). "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options."  *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015)). In assessing prudence, courts evaluate whether the fiduciary "employed the appropriate methods to investigate the merits of the investment" at the time of the challenged transaction.  *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004).   Thus, "the court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction."  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (quoting *Howard*, 100 F.3d at 1488).

7.      Third, and related to the duty of prudence, ERISA requires fiduciaries to act
        "in accordance with the documents and instruments governing the plan."  29
        U.S.C. § 1104(a)(1).

<u>Liability for Breach by Co-Fiduciaries</u>

8.      In addition to these primary duties, fiduciaries may be liable under ERISA
        for breaches by co-fiduciaries under at least two circumstances.

9.      First, a fiduciary "shall be liable for a breach of fiduciary responsibility of
        another fiduciary with respect to the same plan" if (1) "he participates
        knowingly in, or knowingly undertakes to conceal, an act or omission of
        such other fiduciary, knowing such act or omission is a breach, (2) "by his
        failure to comply with [his fiduciary duties] in the administration of his
        specific responsibilities which give rise to his status as a fiduciary, he has
        enabled such other fiduciary to commit a breach," or (3) "he has knowledge
        of a breach by such other fiduciary, unless he makes reasonable efforts under
        the circumstances to remedy the breach."  *Id.* § 1105(a).

10.     Second, while ERISA permits the delegation of fiduciary duties under
        certain circumstances, *id.* § 1105(c), it imposes a "limited duty" upon the
        primary fiduciaries to monitor and review the performance of their
        appointed fiduciaries to ensure that they are fulfilling their fiduciary
        obligations.  *Lauderdale v. NFP Ret., Inc.*, No. 8:21-CV-301-JVS, 2022 WL
        17260510, at *24 (C.D. Cal. Nov. 17, 2022); *In re Computer Scis. Corp.
        ERISA Litig.*, 635 F. Supp. 2d 1128, 1144 (C.D. Cal. 2009).  "An appointing
        fiduciary 'must act with prudence in supervising or monitoring the agent's
        performance and compliance with terms of delegation'" and "should 'review
        the performance of [its] appointees at reasonable intervals and in such a
        manner as may be reasonably expected to ensure that their performance has
        been in compliance with the terms of the plan and statutory standards.'"
        *Lauderdale*, 2022 WL 17260510, at *24 (quoting Restatement (Third) of
        Trusts § 80 cmt. D(2); *In re Computer Scis. Corp.*, 635 F. Supp. 2d at 1144).
        Delegating fiduciaries cannot "abdicate their duties under ERISA merely
        through the device of giving their lieutenants primary responsibility for the
        day to day management" of the plan.  *Leigh v. Engle*, 727 F.2d 113, 135 (7th
        Cir. 1984).  When delegating fiduciaries know that their delegees have
        conflicting loyalties with respect to investments, they must "take prudent
        and reasonable action to determine whether the administrators were fulfilling
        their fiduciary obligations," although they need not examine every action
        taken by the delegees.  *Id.*

11.      A claim for breach of the duty to monitor is derivative of the underlying claim for breach of fiduciary duty. *Lauderdale*, 2022 WL 17260510, at *24. Thus, if the underlying claim fails, the claim for violation of the duty to monitor also fails. *In re Computer Scis. Corp.*, 635 F. Supp. 2d at 1144.

## Prohibited Transactions

12.      In addition to the imposition of the general fiduciary duties described above, ERISA prohibits fiduciaries from engaging in specific transactions irrespective of whether the plaintiff can independently establish a breach of fiduciary duty. These prohibited transactions are codified in 29 U.S.C. § 1106(a) and (b).

13.      Relevant to Plaintiffs' surviving claims, § 1106(a)(1) prohibits a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—(A) sale or exchange, or leasing, of any property between the plan and a party in interest; . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

14.      Subsection (b), in turn, prohibits a fiduciary from (1) "deal[ing] with the assets of the plan in his own interest or for his own account" or (2) "act[ing] in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." *Id*. § 1106(b).

## Loss

15.      Under ERISA, a fiduciary who breaches his duties "shall be personally liable to make good to [the] plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). Section 1109(a) also permits recovery of losses caused by a prohibited transaction. *See Kim v. Fujikawa*, 871 F.2d 1427, 1430 (9th Cir. 1989) (affirming award under § 1109(a) for prohibited transaction).

16.      A fiduciary must pay only the damages resulting from the portion of the investment that was imprudent, not the entire amount of the investment. *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001).

17.    In determining loss, "the measure of damages is the amount that affected accounts would have earned if prudently invested." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007); *see also Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("[W]e hold that the measure of loss applicable under [§ 1109] requires a comparison of what the Plan actually earned on the [imprudent] investment with what the Plan would have earned had the funds been available for other Plan purposes.  If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained.").

18.    "When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered." *Cal. Ironworkers*, 259 F.3d at 1047.  Where several alternative investment options were equally plausible, courts "should presume that the funds would have been used in the most profitable of these." *Donovan*, 754 F.2d at 1056.

19.    "[T]o determine whether there was a loss, it is reasonable to compare the actual returns on [the improperly selected] portfolio to the returns that would have been generated by a portfolio of benchmark funds or indexes" not affected by the fiduciary breach.  *Brotherston*, 907 F.3d at 34; *accord Cal. Ironworkers*, 259 F.3d at 1047 (approving reliance on benchmark as appropriate basis for comparison).[8]

<u>Plaintiffs' Failure to Prove Loss</u>

20.    During the Class Period, the flexPATH TDFs outperformed most other to-retirement TDFs and all three of the benchmark indices that are appropriate comparators in this case:  the Dow Jones Target Date Total Return Index, the S&P Target Date Total Return Index, and the S&P Target Date To Retirement Index.  Using any of these indices as a comparator, the Plan earned more through its investment in the flexPATH TDFs than it would have earned if the Plan's funds had been otherwise invested in a prudent

---

[8] The Court in its summary judgment ruling used the term "benchmark" imprecisely as a synonym for "comparator" when discussing *Brotherston*.  Dkt. No. 189 at 16 n.10.  *Brotherston* appears to use "benchmark" more narrowly, adopting its meaning as a term of art in the investment industry to refer to a composite measure of the average returns of a relevant subset of the investible universe (e.g., the S&P 500) against which performance may be measured.

alternative selected by a prudent and loyal fiduciary.  Accordingly, even using the most profitable reasonable benchmark, the selection and retention of the flexPATH TDFs as the Plan's QDIA did not cause a loss to the Plan.

21.    Plaintiffs summarily suggest that payment of fees to flexPATH constituted an additional loss to the Plan because the money paid as fees could otherwise have been invested in other opportunities.  Dkt. No. 244-1 at 109. The funds paid to flexPATH for its services as a 3(38) investment manager total less than $550,000.  The flexPATH TDFs earned $3,276,260 more during the Class Period than the best-performing benchmark index (the S&P Target Date Total Return Index).  Thus, even assuming that Plaintiffs' theory is otherwise legally viable, which the Court does not decide, and that the investment manager fees paid to flexPATH should be considered as part of the loss calculation, the Plan still outearned the strongest benchmark by more than $2.7 million during the Class Period.  The Plan therefore suffered no losses even if the investment manager fees are considered.

22.    The Court's determination that the selection and retention of the flexPATH TDFs caused no loss to the Plan does not turn on who bears the burden of proof on causation.  It is undisputed that the flexPATH TDFs outperformed all three benchmark indices, and the Court has determined as a factual matter that those indices—rather than the TDFs identified by Dr. Buetow—provide the appropriate comparators for loss determination.

23.    Because the Plan did not suffer any loss, the Court need not resolve the parties' dispute over who bears the burden of establishing causation.  *See Brotherston*, 907 F.3d at 35 ("Our sister courts are split on who bears the burden of proving or disproving causation once a plaintiff has proven a loss in the wake of an imprudent investment decision.") (collecting cases); Dkt. No. 189 at 14–15 (declining to resolve the parties' dispute because fact issues precluded summary judgment regardless of who bears the burden).

24.    The absence of any loss to the Plan precludes Plaintiffs from recovering under § 1109(a) on any of their claims.

25.    Because Plaintiffs have not shown any loss to the Plan from the selection or retention of the flexPATH TDFs as the Plan's QDIA, there is no need for the Court to determine whether any Defendant breached its fiduciary duties of prudence, loyalty, or compliance with plan documents or engaged in a prohibited transaction, whether any such breach or prohibited transaction

occurred within the repose period, or whether any defendant may be
vicariously liable for a co-defendant's breach.

### Other Remedies

26.    Plaintiffs assert that if the Court does not accept their theory of damages, it
       has an obligation to fashion its own remedy.  *See Tussey v. ABB, Inc.*, 850
       F.3d 951, 959–60 (8th Cir. 2017) (explaining that district court should have
       considered alternative approaches to calculating damages).  But this is not a
       case in which Plaintiffs have merely failed to provide an appropriate
       damages model for measuring the loss to the Plan.  Instead, the Court finds
       based on the trial record that there was no loss to the Plan.  Absent a loss,
       there are no damages to measure—and thus no basis under § 1109(a) to
       order that fiduciaries "make good to [the] plan any losses to the plan
       resulting from [their] breach."

27.    Plaintiffs also briefly request that flexPATH be ordered to disgorge either
       the fees it received for its investment management services or other
       unspecified profits for which Plaintiffs seek an accounting.  The precise
       remedy Plaintiffs seek appears to be a moving target.  In their closing
       argument, Plaintiffs asserted that they had "pursued disgorgement in terms
       of the amount that's been paid to flexPATH, which is, in our view, a
       prohibited transaction."  Dkt. No. 252 at 1301:16–18.  In their rebuttal
       argument, they referred again briefly to "the disgorgement of the fees,"
       contending that, "[i]f nothing else, we have established that flexPATH did
       not earn the 543-some-odd-thousand dollars that it received in fees from
       participants.  And those can be ordered to be disgorged and that lost
       investment opportunity would come into play."  Dkt. No. 253 at 1443:9–14.
       In their proposed findings of fact and conclusions of law (both before and
       after trial), however, they appear to seek unspecified profits other than the
       investment manager fees paid to flexPATH, claiming that "[b]ecause
       information regarding flexPATH's profits is in its sole possession, an
       accounting is needed to ascertain the amount that flexPATH must restore to
       the Plan. . . . All such profits must be restored to the Plan."  Dkt. No. 196-1
       at 77; Dkt. No. 244-1 at 109–110.

28.    Under 29 U.S.C. § 1109(a), a fiduciary that breaches its duties to an ERISA
       plan may be required to "restore to such plan any profits of such fiduciary
       which have been made through use of assets of the plan by the fiduciary."

29.    To the extent Plaintiffs seek disgorgement of the 3(38) investment manager fees paid to flexPATH, they have not shown that flexPATH received those fees for selecting the flexPATH TDFs as the Plan's QDIA, nor that the fees are profits that flexPATH "made through use of assets of the plan." Molina was required by the IMA to pay these fees to flexPATH for its services as the investment manager, regardless of whether the flexPATH TDFs were the Plan's QDIA.[9] Moreover, the payment of flexPATH's required fees for these services was not itself a fiduciary act but rather a "purely ministerial" act that does not give rise to fiduciary liability. *See Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 840 (9th Cir. 2018) ("[A]t least with respect to withdrawing its formula-driven fee from the pooled accounts, [the plan administrator's] actions were purely ministerial.").

30.    To the extent Plaintiffs seek disgorgement of other unspecified profits flexPATH received apart from its investment manager fees, Plaintiffs have not identified any such profits to be disgorged, nor any nonspeculative basis for ordering an accounting.

31.    Because the Plan suffered no loss from any Defendant's alleged breach of fiduciary duty or prohibited transaction, and Plaintiffs have not identified

---

[9] Plaintiffs' SAC alleged a separate claim against the Molina Defendants for breach of fiduciary duties based on their selection of FlexPATH as the 3(38) investment manager. Dkt. No. 79 ¶¶ 160–67. The Court granted the Molina Defendants' motion to dismiss this claim because "Plaintiffs ha[d] not plausibly alleged any losses caused by the selection of flexPATH as an investment advisor, separate from the losses allegedly caused by the selection of the flexPATH Funds." Dkt. No. 123 at 26. Since the SAC alleged that the hiring of flexPATH as an investment manager was caused by the decision to add the flexPATH TDFs to the Plan, and the only losses it alleged were those caused by investment in the TDFs, the Court found that "[i]n the absence of any identified losses independently caused by the hiring of flexPATH, Plaintiffs have not alleged a plausible claim to recover separately for that breach." *Id*. The 3(38) fees paid to flexPATH for its services arguably could have been alleged as losses resulting from the hiring of flexPATH as an investment manager. However, the SAC did not mention the 3(38) fees and instead described additional fees charged based on investment in the flexPATH TDFs, Dkt. No. 79 ¶¶ 59–60, as well as from using higher-cost versions of investments, *id*. ¶¶ 107–18.

any remedy to which they are entitled, Plaintiffs cannot recover on any of their claims in the Second Amended Complaint.

32.   Defendants are therefore entitled to judgment in their favor on all claims.

<u>DISPOSITION</u>

In light of the above-stated findings of fact and conclusions of law, the Court finds that Plaintiffs are not entitled to recover on any of their claims.  Plaintiffs' claims against all Defendants are therefore DISMISSED on the merits with prejudice.

Defendants shall meet and confer with Plaintiffs and no later than March 27, 2024 shall file a proposed final judgment that is agreed as to form.

Date: March 20, 2024

                                                                 _____

Stanley Blumenfeld, Jr.
United States District Judge